## Schultz Estate

*John H. Bream*, for administrator.

*Vincent Mullin*, for claimants.

*Ralph S. Snyder*, for Commonwealth.

SWOPE, P. J., July 16, 1963.—Hugo Schultz died, intestate, March 27, 1958, a resident of Enhaut, Dauphin County, Pa. Letters of Administration were duly granted to Lewis F. Adler, a member of the Dauphin County Bar. On November 7, 1960, administrator filed his first and final account, showing a balance in the estate for distribution of $85,827.57.

In his suggested schedule of distribution, filed concurrently with his account, administrator disclosed that certain persons, resident in Germany, claimed to be relatives of decedent within the ambit of consangunity required by the Intestate Act of April 24, 1947, P. L. 80, 20 PS §1.1, to entitle them to share in his estate. These persons are: Anna Lindeholtz, who claims to be the sister of decedent's father, and seven persons, claiming to be the children of decedent's father's brothers and sisters, to wit: Anna Abel, Anna Gabriel, Ida Hahn, Carl Hochschild, Otto Wendel, Anna Wendel and Elise Jaensch.

The Commonwealth of Pennsylvania, contending that claimants have not proved the required relationship to decedent, claims as the ultimate heir of Hugo Schultz under the provisions of the Intestate Act or, in the alternative, that it is the rightful custodian of his estate under The Fiscal Code of April 9, 1929, P. L. 343, art. XIII, sec. 1314, 72 PS §1314.

In the hearings subsequently held, claimants offered 88 exhibits consisting, inter alia, of birth, death and marriage records from Pennsylvania, Germany and Poland. In addition, a large number of letters, allegedly written by claimants or their ancestors to

decedent and his sister in the United States, were furnished. Interrogatories from Germany were also submitted in support of the claims of the alleged heirs.

The Commonwealth objected to most of the documents and all of the interrogatories, contending that they were incompetent as hearsay evidence, not falling within the pedigree or ancient document exception to that exclusionary rule. The Commonwealth further contends that even though the evidence would be held competent, it is, nevertheless still not sufficient to produce clear, precise and definite evidence of claimants' kinship: The District of Columbia's Appeal, 343 Pa. 65 (1941).

Where it becomes necessary to establish relationship or pedigree, the law provides an exception to the hearsay rule, rendering testimony admissible as to statements or declarations with regard thereto made by another than the witness. In order for such testimony to be competent within the pedigree exception, however, the following requirements, as set forth in Sitler v. Gehr, 105 Pa. 577 (1884), at page 592, must be met:

"The rules of evidence applicable to pedigree cases are: 1. That the statements must be made *ante litem motam*. 2. Declarant must be dead. And 3. But a prior condition to both these is, that it should be proved by some source of evidence independent of the statement itself, that the person making the statement is related to the family about which he speaks: Smith v. Tebbitt, L. R., 1 P. & D., 354."

In Gustav Lindeholz's first interrogatory, he indicated that declarant upon the strength of whose declarations his knowledge of the kinship is based, was his mother. While 94 years of age, she is still living. Her

declarations, therefore, cannot be taken as falling within the exception.

In an effort to qualify his mother's declarations in spite of the rule, her son claims in his interrogatories that she is "no longer fully capable". We are unwilling to accept his opinion with regard to his mother's competency to testify as to her family tree. We know of no instance where the pedigree exception has been enlarged to make either advanced age or reduced mental capacity on account thereof the equivalent of being dead for the purposes of the rule. Even though we were willing to allow such an extension, under no circumstances should this be done except upon proper proof of an adjudication of incompetency or at least by otherwise legally competent medical evidence. In no case could a self-serving declaration, on the part of one directly interested in the outcome of the litigation, who has no special qualifications as an expert in such matters, be accepted. In a second interrogatory, Lindeholz, in an apparent effort to correct the inherent weakness in his answers in the first interrogatory, states that he also received information from several other persons who are deceased. There is no indication, however, as to which information was acquired from which person. We must assume, therefore, that each answer was supplied by the declaration of his mother, making this second interrogatory incompetent as the first.

Two other interrogatories were filed. These were from Anna Gabriel and Elise Jaensch. Declarants were Luise Hochschild, the alleged mother of Wilhelm Schultz and Karoline Hochschild Wendel, his alleged sister. Both of these declarants are dead. Before their declarations may be considered admissible, however, it must be shown by competent evidence dehors their declarations that they were related to Wilhelm Schultz, father of decedent.

The same requirement attaches to each of the letters written by the alleged relatives of decedent. Claimants attempt to meet this requirement through the vital statistics from the United States, Germany and Poland.

The Commonwealth objected to the admission of birth, marriage and death certificates from Germany and Poland presented by claimants to show anything more than the mere fact of birth, marriage or death. This objection must be sustained, as the information on the documents is hearsay unless claimants can show that the law in Germany, as of the time the documents were recorded, was such that these documents would have been received into evidence. No such evidence was offered. In its absence, Pennsylvania law of that time must be presumed. See Linton v. Moorhead, 209 Pa. 646 (1904). The Uniform Judicial Notice of Foreign Law Act of May 4, 1939, P. L. 42, sec. 1, 28 PS §291, et seq., is not applicable to the law of foreign countries. See Lyon Trust, 164 Pa. Superior Ct. 140 (1949).

Pennsylvania passed its first Vital Statistics law in 1851, the Act of April 14, 1851, P. L. (1852) 2. In section 8 of that act, however, it was declared that the birth, death and marriage records recorded thereunder were only to be taken as evidence of the birth, death or marriage, and that the other facts contained in the record were not to be so taken. It was not until the Act of June 6, 1893, P. L. 340, sec. 5, that all facts contained in such records became admissible in evidence. Nevertheless, the Act of 1893 was limited in its scope to birth and death records only and not to marriage records. An examination of the vital records from Germany and Poland submitted by the claimants in light of the Pennsylvania statutes fails to produce any recitation of pedigree which would be admissible to establish a relationship between any of the declar-

ants in the interrogatories or the letters submitted with the decedent or his father, Wilhelm Schultz. Accordingly, we hold that none of the interrogatories nor any of the letters submitted are admissible as evidence. They do not meet the requirements of the pedigree exception to the hearsay rule since it has not been proven by some source dehors the declarations that the persons making the statements were related to the family about which they spoke. The interrogatory of Lindeholz is inadmissible for this reason and for the additional reason that declarant therein is still living.

Claimants also suggest that since many of the documents submitted are more than 30 years old, the "ancient document" rule should apply. A distinction must be made, however, between the ancient document rule for the purpose of dispensing with proof of execution and the ancient document exception to the hearsay rule. The latter is more limited than the former and, in Pennsylvania, applies usually only to ancient deed or will recitations. Although, in recent years, great inroads have been made into the hearsay rule, increasing the number and enlarging the scope of the exceptions thereto, the Uniform Rules of Evidence have restricted the application of the ancient document exception to traditional concept: Uniform Rule 63-(29). We are constrained, therefore, to hold that none of the documents offered by claimants is admissible under this exception.

Although our position may appear to be narrowly technical, particularly where many of the records offered come from State archives, we must be guided by the language of Justice Kephart, in Link's Estate (No. 1), 319 Pa. 513 (1935), at page 522, as follows:

"If a chain of relationship can be built up through birth certificates and ex parte statements, as offered here, there would be no escheated estates in Pennsylvania."

The above statement, in cases such as the one before us now, places upon the court a responsibility for the rigid observance of the rules of evidence.

Certain evidence offered by claimants was admitted into the record without objection. This evidence consisted of the death certificates of decedent, his mother, father and sister, all issued by the Pennsylvania Department of Health, Bureau of Vital Statistics. In addition, photographs of graves in Germany and the United States, the German graves purported to be those of sisters of decedent, were also admitted. Both the Pennsylvania death certificates and the photographs of the graves appear to be clearly admissible. The certificates must further be taken as prima facie evidence of their contents. See the Act of June 29, 1953, P. L. 304, art. VIII, sec. 810, 35 PS §450.810. See also Kubacki v. Metropolitan Life Insurance Company, 193 Pa. Superior Ct. 138 (1960). We find nothing in the declarations in these death certificates nor in the inscriptions on the gravestones shown in the photograph, however, which would connect decedent or his father to the family tree of claimants.

Claimants further offered into evidence a so-called "obituary" allegedly prepared by the sister of decedent, upon the occasion of their father's death in 1927. This "obituary" was hand written and claimants proved by expert testimony that the handwriting was in fact that of Ella Schultz, sister of decedent. This "obituary" will be admitted as a part of the record. Nevertheless, we are of the opinion that the facts stated therein, even though admitted, in no way serve to substantiate the claims of the alleged heirs in Germany. It states in essence that Wilhelm Schultz was born in Brandenburg, Prussia, on May 15, 1851, came to this country in 1882, settled in Steelton, was survived by a son and daughter, Hugo and Ella, and that he had four sisters living in Germany, three in Brandenburg and one in

Weimar, Thuringia. The statement did not identify Wilhelm Schultz's parents nor did it name his four sisters in Germany.

Claimants also offered into evidence as exhibits, a map of the Province of Brandenburg and certain bank records. We do not feel that this final miscellany materially benefits the claims of the alleged heirs.

Based on all of the foregoing we are firmly of the opinion that claimants have failed to establish kinship or relationship with decedent so as to entitle them to share in his estate under the laws of this Commonwealth. It will be necessary, therefore, to dismiss their claims.

Even though our denial of the claims rests substantially on technical rules of evidence, we point out that even though all of the evidence submitted by claimants would be conceded to be competent and, therefore, admissible, the record thus fully implemented would still be fraught with glaring inconsistencies and, in light of the massive documentary evidence offered, marked by the conspicuous absence of certain vital records which the court deems most significant.

According to the family tree submitted by claimants, upon which they base their claim of relationship to this decedent, the father of Hugo Schultz was actually born Hochschild. Yet, the father with whom Hugo and his sister lived in Enhaut, Pa., was named Wilhelm Schultz. No evidence of any official record, by which a change of name from Wilhelm Hochschild to Wilhelm Schultz was effected, has been offered by claimants. In addition, although vital records were furnished concerning the birth, marriage and deaths of many others of the family tree during the general period in which the birth of decedent and his father occurred, no birth certificates were offered for either of these persons. The explanation given was that these records must have been destroyed as a result of the wars which raged through-

out that portion of Europe during the latter half of the nineteenth century. This explanation would be entitled to much greater weight if no records whatsoever had been found available with regard to members of the family of claimants. The fact that such records did exist, however, and were secured for the purposes of these claims, leads us to suspect rather that the absence of birth records for Hugo Schultz and his father strongly sugests that no such records may ever have existed in the form claimed in the instant case. The only evidence to substantiate a change of name for decedent's father from Hochschild to Schultz are the self serving declarations, based upon hearsay given by certain of claimants in their interrogatories, to the effect that Wilhelm Hochschild changed his name to Schultz because he preferred the latter name to his own. When we add to this already weak explanation the further fact that Ella Schultz, in supplying the information for her father's death certificate in 1927, gave his name as Schultz and indicated that his father's name was also Schultz, we cannot fairly conclude that any change of name such as is claimed by the alleged heirs in this case, ever took place.

One possible explanation for Ella's supplying the information that her father's was named Schultz rather than Hochschild, as is claimed in the family tree submitted by claimants, is suggested by an examination of dates of birth and marriage surrounding Wilhelm Schultz's advent into this world. The date of Wilhelm Schultz's birth is given as May 15, 1851. We note from the family tree that his alleged parents, Wilhelm Hochschild and Louise Sophie Wendt, did not marry until June 9, 1851, approximately three weeks after his date of birth. This suggests strongly that Wilhelm Schultz may have been a natural child whose paternity was never fully established. Claimants take the position that a subsequent marriage of the parents of a child

born out of wedlock, in accordance with Pennsylvania law, which must govern the instant situation, serves to legitimize that child. We must agree with this basic assertion insofar as the legitimization which results from such a marriage. We must point out, however, that there is no evidence whatsoever in this record to indicate that Wilhelm Hochschild was the natural father of Wilhelm Schultz nor that Louise Sophie Wendt was his natural mother. There is every possibility that this child, Wilhelm Schultz, may have been taken into the home of Wilhelm Hochschild and raised as one of the children in the home, even though there existed no relationship whatsoever between those in the home and the child himself. The possible circumstances which might have led to such an arrangement are myriad. We do not perceive it to be our function to examine into these possibilities.

We note, further, that although claimants claim that Wilhelm Schultz was born in Posen, Germany, his daughter Ella, in furnishing the information for his death certificate, said that he was born in Brandenburg, Prussia. Posen and Brandenburg are in fact more than 150 miles apart.

We do not doubt that there was some close bond between the Schultz family in America and the Hochschild family in Germany. It is entirely possible that the father of decedent was, in fact, raised along with the Hochschild children. We are further of the opinion that the closeness of the bond between the Schultz and Hochschild families was sufficient for all concerned to consider one another "family". We are unable to find, however, that the alleged heirs presently claiming the estate of Hugo Schultz have established a familiar tie with decedent by competent evidence sufficient to produce clear, precise and definite proof of their kinship so as to entitle them to claim as heirs in his estate. As

322

was said in Link's Estate (No. 1), 319 Pa. 513 (1935), at page 519:

"We have no doubt that pedigree may be proven by certain types of hearsay evidence, but kinship which carries with it a claim of property against the claim of the State should be proved by something more than a guess, it should be built on a sound basis."

Against the possibility that the present claimants may at some future date be able to produce additional evidence sufficient to establish their claims, and based upon what we consider to be ample precedent in similar cases in this Commonwealth, (See Prusak Estate, 29 D. & C. 2d 329; Choma Estate, 30 D. & C. 2d 157; Stevens Estate, 28 D. & C. 2d 658; Tamaszwicz Estate, 17 D. & C. 2d 12) we make the following

*Order*

And now, July 16, 1963, the within claims are hereby dismissed and the distribution of the within estate is awarded to the Commonwealth of Pennsylvania, for payment into the State Treasury, through the Department of Revenue, without escheat, pursuant to section 1314 of The Fiscal Code of April 9, 1929, P. L. 343. The said award is made, however, without prejudice to the rights of claimants in a future proceeding to establish their claims of kinship with decedent, in accordance with the requirements of law.